**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PAULINE H. HILL,**

      **Plaintiff,**

**v.**                                   **CASE NO. 3:09-cv-00705**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

**M E M O R A N D U M   O P I N I O N**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (SSA) denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

      Plaintiff, Pauline H. Hill (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on March 6, 2006, alleging disability as of January 24, 2006, due to the following conditions: fibromyalgia, valve prolapse, irritable bowel syndrome, fallen bladder, kidney stones, restless leg syndrome, depression, high blood pressure, hardening of the arteries, leaky heart valve, chronic back and chest pain, and chronic obstructive pulmonary disease (hereinafter referred to as "COPD").  (Tr. at 114-116, 198).  The claims were denied initially and upon reconsideration.  (Tr. at 73-77, 78-82, 84-86, 87-89).  The Claimant requested a hearing before an Administrative Law Judge.  (Tr. at 92).  The hearing was held on June 2, 2008, before the Honorable Andrew J.

Chwalibog (hereinafter referred to as the "ALJ"). (Tr. at 36-68). By decision dated July 23, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-23). The ALJ's decision became the final decision of the Commissioner on April 21, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On June 20, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b).

If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is

2

whether the claimant's impairments prevent the performance of past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).

By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2008).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review."  20 C.F.R. §§404.1520a, 416.920a(a).  First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.  If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§404.1520a(c) and 416.920a(c).  Those sections provide as follows:

c) *Rating the degree of functional limitation*.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We

will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00 C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment, the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria

4

of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§404.1520a(e)(2) and 416.920a(e)(2)

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 15, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of fibromyalgia, mitral valve prolapse, and depression/anxiety. (Tr. at 15, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4). The ALJ then found that Claimant had a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 18, Finding No. 5). As a result, Claimant could not return to her past relevant work. (Tr. at 22, Finding No. 6). Nevertheless, the ALJ concluded that Claimant could

perform jobs such as hand packager, machine tender, grader/sorter, assembler, benchworker, and inspector, which exist in significant numbers in the national economy. (Tr. at 22-23, Finding No. 10). On this basis, the ALJ denied benefits. (Tr. at 23).

## I.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's applications for benefits is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the Decision of the Commissioner is supported by substantial evidence.

## II.      Claimant's Background

Claimant was 46 years old at the time of the administrative hearing and at the time of the ALJ's Decision. (Tr. at 40). Claimant completed the sixth grade. (Tr. at 40). She attempted to earn a GED, but was unsuccessful. (Tr. at 40). In the past, she worked as a waitress, a nurse's aide, a maid, and a home health care aide.  (Tr. at 161).

## III.    The Medical Record

The Court has reviewed all evidence of record, including the medical evidence of record, and will discuss it below. The record includes medical evidence that pre-dates Claimant's alleged disability onset date of January 24, 2006.  The Court considered this evidence to the extent that it elucidates Claimant's medical background.

The record includes Claimant's disability determination evaluation from North Carolina Disability Determination Services dated December 18, 1990. (Tr. at 218-221). The evaluation summarizes that Claimant was poorly-educated with few work skills and had severe, recurrent depression. (Tr. at 220).

The record also includes a discharge summary from Franklin Regional Medical Center, where Claimant was evaluated and treated for depression and anxiety on December 27-29, 1990. (Tr. at 211-213). The discharge diagnosis lists "major depression, single episode, moderate" and rules out generalized anxiety disorder and post traumatic stress disorder. (Tr. at 212-213). Claimant was discharged "on no medications" and was scheduled for a follow-up visit. (Tr. at 213).

On April 21, 1992, Claimant was assessed by a social worker at Thomas Psychiatric Center. (Tr. at 266-269). Claimant reported to the social worker that she had mitral valve prolapse. (Tr. at 268). On the same day, April 21, 1992, Claimant was given

7

an echocardiogram, which showed no evidence of mitral valve prolapse. (Tr. at 265). On June 11, 1992, Claimant's chest x-ray was reported as "unremarkable" with no evidence of mitral or tricuspid valve prolapse. (Tr. at 248-249).  Claimant also received a chest x-ray on July 1, 1990, which showed no evidence of acute pulmonary disease. (Tr. at 230).

On March 27, 2006, Claimant was evaluated by psychologist Elizabeth A. Durham, M.A.   (Tr. at 298-302). Claimant was diagnosed with "major depressive disorder, recurrent, moderate" and borderline intellectual functioning. (Tr. at 301). Dr. Durham found that Claimant's verbal IQ was 83, her performance IQ was 77, and her full scale IQ was 78. Id. Dr. Durham found that Claimant's social functioning, pace, and ability to stay on task was within normal limits. (Tr. at 301-302). Dr. Durham also found that Claimant was capable of managing finances. (Tr. at 302).

After Claimant filed applications for benefits in 2006, the Social Security Administration requested Holly Cloonan, Ph.D., to assess Claimant's mental residual functional capacities ("RFC") based on her independent review of Claimant's medical evidence. (Tr. at 316-334). Dr. Cloonan concluded on July 7, 2006 that a RFC was necessary based on the following dispositions: (1) borderline intellectual functioning and (2) major depressive disorder, recurrent, moderate. (Tr. at 318, 320). Dr. Cloonan rated Claimant's mental functional limitations as "mild." (Tr. at 327). The report concluded that Claimant was credible in her report of long-standing depression, but that she did not take medication for the condition. (Tr. at 329). Claimant did have intellectual limits associated with her borderline intellectual functioning, but was "able to learn and perform repetitive work-like activities." (Tr. at 333). Dr. Cloonan concluded

that Claimant did not medically meet or functionally equal the listings for a disabling condition. (Tr. at 329).

On August 14, 2006, Claimant was evaluated by Stephen Nutter, M.D., at Tri-State Occupational Medicine. (Tr. at 335-339). The Claimant reported shortness of breath, chest pain, and joint pain.   (Tr. at 338). The report lists the following impressions: chronic obstructive pulmonary disease ("COPD"), chest pain, and degenerative arthritis. (Tr. at 338).

On August 15, 2006, Claimant first saw Dr. Curtis B. Pack, D.O., as a new patient. Claimant reported a history of fibromyalgia, COPD, irritable bowel syndrome, and mitral valve prolapse. (Tr. at 544). Dr. Pack noted Claimant's symptoms according to her narrative and discussed a treatment plan with her. (Id.)

On August 23, 2006, under the supervision of Dr. Pack, Claimant was given an echocardiogram. (Tr. at 542-543). The test showed that her "left arterial chamber was within normal limits," that she had "mild mitral regurgitation," that there was "mild bowing of the mitral valve with no definite evidence of mitral valve prolapse" and "no mitral stenosis," and that all other results were normal. (Id.)

On August 28, 2006, while still under the care of Dr. Pack, Claimant was given a computed tomography ("CT") scan of her abdomen and pelvis because she complained of epigastric pain and chronic diarrhea. (Tr. at 540-541). The x-ray showed no explanation for Claimant's symptoms. (Id.) The examination was concluded to be "unremarkable." (Id.)

The Social Security Administration then requested Amy Wirts, M.D., to assess Claimant's physical residual functional capacities based upon an independent review of

Claimant's medical evidence. (Tr. at 341-349). On August 28, 2006, Dr. Wirts concluded that Claimant's exertional limitations were "medium." (Tr. at 343). Dr. Wirts found Claimant to be "partially credible," but that the alleged severity of her impairments was not well-supported. (Tr. at 347). Claimant took no medications for her impairments. (Id.). She previously took Tenormin for her mitral valve prolapse, but was not taking it at the time of Dr. Wirts' report. (Id.). Dr. Wirts found no evidence to support fibromyalgia and stated that the lung exam was normal. (Id.).

On September 12, 2006, Claimant was evaluated for shortness of breath by William N. Payne, M.D., at the Charleston Area Medical Center Emergency Department. (Tr. at 448-450). Dr. Payne determined that Claimant's symptoms were a result of COPD. (Tr. at 450). He prescribed Albuterol, prednisone for five days, Levaquin for seven days, and a follow-up with Claimant's family doctor. (Id.).  On September 28, 2006, Claimant's chest pain was evaluated by Robert Gemora Tayengco, M.D., at Pleasant Valley Hospital. (Tr. at 351-353).  Dr. Tayengco concluded that Claimant's chest pain was "probably related" to pleurisy, COPD, and bronchitis. (Tr. at 353). Dr. Tayengco's plan was to give Claimant antibiotics, nebulizer treatments, and to rule out ischemia. (Id.). He stated that her "prognosis was good." (Id.). An examination of Claimant's chest corroborated the likelihood of COPD. (Tr. at 357).

On September 29, 2006, Claimant was given a radiograph of her chest at the directive of Dr. Pack. (Tr. at 538). Based on this test, Dr. Pack, found that Claimant's chest findings suggested COPD. (Id.)

On December 12, 2006 Claimant was given a left heart catheterization, selective coronary angiography, and left ventriculography at Charleston Area Medical Center by

Mohammed Yaser Haffar, M.D. (Tr. at 474-475). The test showed normal coronary arteries and normal left ventricular systolic function. (Tr. at 485). Dr. Haffar followed up with Claimant on January 4, 2007, noting that her chest pain was atypical because the test showed normal coronary arteries. (Id.). Dr. Haffar also noted tobacco use and COPD. (Id.). He advised Claimant to quit smoking, to continue on a low fat and low cholesterol diet, and to come in for a follow-up visit the following year. (Id.).

On February 8, 2007, Dr. Pack evaluated Claimant. (Tr. at 534-535). Under "recommendations for further tests or treatment," Dr. Pack noted the following: "heart cath 1/12/2006, CXR COPD, abnormal cardiac stress test." (Tr. at 535). He noted that Claimant complained of chronic lumbar pain and COPD and that she had a "25+" year history of tobacco use. Id.

On February 21, 2007, A. Rafael Gomez, M.D., reviewed Claimant's medical evidence and affirmed the findings of Amy Wirts, M.D., dated August 28, 2006 and discussed above. (Tr. at 492-495). On February 22, 2007, Timothy Saar, Ph.D., evaluated Claimant's mental evidence, including evidence of borderline intellectual functioning and depression, and found her mental impairments to be "not severe." (Tr. at 492-509). Dr. Saar found that Claimant appeared credible and that she could manage basic daily life activities and social interactions. (Tr. at 508).

The most recent piece of medical evidence in the record is a residual functional capacity assessment conducted by M.C. Shah, M.D., on May 28, 2008. (Tr. at 546-550). Regarding exertional factors, Dr. Shah found that Claimant could, on a sustained or continual basis throughout a 6 to 8 hour work day, (1) lift and/or carry less than 10

pounds, (2) stand and/or walk 2 to 4 hours, (3) sit 4 to 6 hours, and (4) push and/or pull to operate hand and/or foot controls while seated. (Tr. at 547-548).

Based on these findings, Dr. Shah concluded that Claimant was capable of performing less than a full range of sedentary work. (Tr. at 548). Dr. Shah found that Claimant could, on a sustained basis throughout a 6 to 9 hour work day, (1) frequently perform the following activities: feeling, seeing, hearing, and speaking; (2) occasionally perform the following: balancing, kneeling, reaching, simple and firm grasping, fine manipulation, and driving a car; and (3) never perform the following: climbing, stooping, crouching, and crawling. (Tr. at 548-549).

Regarding non-exertional restrictions, Dr. Shah found that Claimant could not work under the following conditions: temperature extremes, relating to co-workers and supervisors, stress, tasks requiring the ability to concentrate or remember, moving machinery, or relating to the public. (Tr. at 549). Dr. Shah listed Claimant's diagnoses as fatigue/lethargy, hypertension, backache, and degenerative joint disease. (Id.)  He did not rate the severity of any of these diagnoses. (Id.)

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence for the following reasons: (1) the ALJ failed to properly read and appreciate the medical evidence in the file, (2) the ALJ failed to consider that Claimant's borderline IQ is a severe impairment, (3) the ALJ failed to offer to the vocational expert a hypothetical that contained all of the limitations that he listed in the Decision, and (4) the ALJ failed to give adequate consideration to the treating doctor's opinion. (Pl.'s Br. at 8-14).

The Commissioner argues (1) the ALJ properly assessed the severity of Claimant's impairments, (2)the ALJ correctly found that  Claimant's impairments in combination did not meet or equal a listed impairment, and (3) the ALJ properly weighed the opinion of Claimant's treating physician. (Def.'s Br. at 6-12).

### A. __The ALJ's Consideration of the Medical Evidence__

Claimant asserts that the ALJ failed to read and appreciate the medical evidence in the file by (1) basing Claimant's physical RFC  wholly on the assessment of a non-examining state expert dated August 28, 2006, (2) not explaining what evidence assisted him in  finding Claimant's mental Residual Functional Capacity (hereinafter referred to as "RFC"), (3) not considering COPD when discussing the listings, (4) not making any specific findings as to fibromyalgia, and (5) finding that Claimant was not diagnosed with irritable bowel syndrome. (Pl.'s Br. at  8-11). The Court finds that these allegations are without merit.

### 1. Claimant's Physical RFC

Between steps three and four of the sequential analysis, the ALJ must determine the Claimant's RFC for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions."  *See* Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a) (2008).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  *Id.*

13

"In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)(2008).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

*Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Claimant's assertion of error is without merit because the ALJ did not solely rely on the state agency assessment dated August 28, 2006 in finding Claimant's physical RFC. Rather, the ALJ considered the entire record, including the objective medical evidence and opinion evidence, in making this determination. (Tr. at 18-21).

The ALJ properly resolved conflicts between the medical evidence and opinion testimony. In evaluating Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, the ALJ found the credibility of Claimant's testimony to be "poor."(Tr. at 21). The ALJ found the limitations cited by Dr. Shah in his 2008 RFC assessment to be "solely based on the claimant's subjective complaints" and "not supported by the evidence as a whole." (Tr. at 21).

It is the domain of the ALJ to resolve inconsistencies in the evidence. "In reviewing for substantial evidence, [the court does] not undertake to re-weigh

14

conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996*). See* also *Smith v. Chater*, 99 F.3d 635, 637 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court.")  In this case, the ALJ considered the evidence and explained his findings as required.  *See King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980).  Accordingly, the ALJ's resolution of evidentiary conflicts concerning Claimant's DIB and SSI Applications was proper.

### 2. Claimant's Mental RFC

Claimant's assertion that the ALJ did not state which evidence he considered in determining Claimant's mental RFC is unfounded. The ALJ discussed the mental evidence that he considered prior to stating Claimant's mental RFC on the sixth page of his Decision. The ALJ refers to the report from Franklin Regional Medical Center dated December 29, 1990 ("Exhibit 1F"); the Hospital Records from Thomas Memorial Hospital dated January 26, 1997 ("Exhibit 3F"); treatment records from James Wagner, DO, dated  March 7, 2006 and May 15, 2006 ("Exhibits 5F, 8F"); and the consultative examination report dated April 11, 2006 ("Exhibit 7F"). (Tr. at 16). In addition, the ALJ refers to Claimant's own statements in the function reports she submitted, ("Exhibits 5E, 10E") as well as her own testimony at the hearing. (Tr. at 17, 20).  In addition, the ALJ provided specific findings as to the degree of limitation of each of the three functional areas described in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). (Tr. at 17-18).

### 3. COPD

Claimant next argues that the ALJ erred by not considering COPD when discussing the listings at step three of the sequential analysis. (Pl.'s Br. at 10).  At the

second step of the sequential analysis, the ALJ considered the COPD evidence, including Claimant's history of treatment for COPD and chest x-rays. (Tr. at 16). Noting the fact that the "[c]onsultative examination in December 2006 showed no evidence of wheezes, rales, or rhonchi," the fact that Claimant "continues to smoke one pack of cigarettes per day," and that fact "there is no evidence the Claimant has had any pulmonary function studies performed and she has not seen a pulmonologist," the ALJ found claimant's COPD was "not a severe impairment." (Id.).

At the third step of the sequential analysis, the ALJ stated that "[t]aking into account all of the claimant's impairments in combination, to include those deemed not severe, they do not meet or equal any of the impairments listed in Appendix 1." Claimant's argument presumably references the fact that the ALJ did not provide additional detail as to why Claimant's COPD does not meet a listing or which listing(s) it does not meet, which is the level of detail that he provided with regard to Claimant's impairments that he found to be "severe."

Contrary to Claimant's assertion, the Regulations do not require the ALJ to provide such additional findings with respect to non-severe impairments. Rather, the ALJ must consider all of Claimant's impairments in combination, including those which are not severe, as the ALJ did here. Social Security Ruling ("SSR") 96-8p, 1996 WL 362207, *34477 (July 2, 1996) (In considering Claimant's residual functional capacity, the ALJ must consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'") As stated, the ALJ fulfilled his obligation of considering all of Claimant's impairments in combination. Therefore, the ALJ did not err as Claimant suggests.

16

Further, "[u]nder the regulations, it is Claimant's burden to prove that her condition equals the criteria of one of the listed impairments." *Spaulding v. Astrue*, 2010 U.S. Dist. LEXIS 96089 (S.D.W.V. 2010). Akin to the Claimant in *Spaulding*, Claimant does not identify a listing which is satisfied by her COPD alone or in combination with her other impairments. (Pl.'s Br. at 9). Claimant does not identify medical evidence relating to her COPD which would satisfy a listing. (Id.).

### 4. Fibromyalgia

Claimant's fourth argument is that the ALJ failed to make any specific findings as to fibromyalgia. The ALJ Decision states that "claimant does not have the deficits required under either listing 1.00 or 11.00 for her fibromyalgia." (Tr. at 17). While this explanation is terse, it does not provide grounds for reversal of the decision.

Courts have applied a harmless-error analysis in the context of Social Security appeals.  One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

Our Court of Appeals, in a number of unpublished decisions, has taken the same approach.  *See,* e.g., *Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th

17

Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

Here, a more thorough discussion by the ALJ as to why Claimant's fibromyalgia does not meet the Listings would not produce a different result. The ALJ's findings are sufficient and are supported by substantial evidence.

The ALJ considered Listing 1.00, which includes disorders of the musculoskeletal system. 20 CFR 404, Subpart P, Appendix 1 (2008). The key inquiry under Listing 1.00 is whether the individual suffers from an extreme inability to walk without the use of a hand-held device or an inability to perform fine and gross movements, including the pain associated with the underlying impairment. Id. Some of the considerations under this listing are whether the person can carry out the activities of daily living, such as shopping and banking, and whether the person can prepare a simple meal to feed oneself and tend to personal hygiene. Id. Claimant is able to perform such activities. For instances, she cares for her pets, prepares meals, performs light house cleaning, drives with no restrictions, leaves her home unassisted, and shops at the grocery store. (Tr. at 40, 50, 149-151).

Pain is a consideration under Listing 1.00. Claimant testified that her fibromyalgia "gets pretty bad" to the point where she "hurt[s] all the time." (Tr. at 44). Although the Court takes Claimant's testimony and all evidence into consideration, it concurs with the ALJ that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent that they are inconsistent with the evidence contained in the record.

18

The ALJ also considered Listing 11.00, which refers to neurological disorders. The criteria under this listing which Claimant's fibromyalgia could potentially satisfy is "persistent disorganization of motor function in the form of...sensory disturbances." 20 CFR 404, Subpart P, Appendix 1 (2008). The Regulations state that the "assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." Id. Claimant testified to a great deal of pain and interference with walking and sitting as a result of her fibromyalgia. (Tr. at 51-55, 62). However, Claimant does not require any assistance when she is walking, nor does she wear a brace for her fibromyalgia. (Tr. at 46). Also, as stated above, she performs daily activities.

As discussed in the preceding section, Claimant is charged with proving that her condition satisfies one of the listed impairments. *Spaulding v. Astrue*, 2010 U.S. Dist. LEXIS 96089 (S.D.W.V. 2010).  Here, the Claimant fails to offer any statement as to how her impairments meets the listings which the ALJ considered or any other listing. Therefore, the Court finds that the ALJ's failure to discuss in detail why Claimant's fibromyalgia does not meet the Listings to be a harmless error.

### 5. Irritable Bowel Syndrome

Claimant final assertion of error on her first point is that the ALJ's findings were inconsistent in that he "found on one page of the decision that [Claimant] has non-severe irritable bowel syndrome based on Exhibit 33," then reported that "she testified to irritable bowel syndrome with diarrhea," and then stated that he found "nothing in the medical evidence of record to show she has been diagnosed with irritable bowel syndrome."(Pl.'s Br. at 10). Claimant further argues:

19

To arrive at this conclusion means that he not only ignored his own prior findings, he also had to ignore medical records from Health Right of West Virginia from 2003, Dr. Pack's treatment notes, and a CT of the abdomen and pelvis done because of chronic diarrhea and epigastric pain...[the fact that she] told the hospital where she was being treated for anxiety and depression that she had irritable bowel syndrome...Dr. Wagner noted a 15 year history of IBS...Also, an Emergency Room note dated March 14, 2002 stated that she had IBS.

(Pl.'s Br. at 10).

Claimant suggests ambiguity or error where there is none.  The ALJ's findings merely state that Claimant reports to have irritable bowel syndrome, and giving her the benefit of the doubt that she has it, it is at most non-severe; however, she has never been officially diagnosed with the condition.

The "medical records from Health Right of West Virginia" and "Dr. Pack's treatment notes" referenced by Claimant only confirm that Claimant *reported* a history of irritable bowel syndrome. (Tr. at 527, 544). Furthermore, although the "CT of the abdomen and pelvis" was, in fact, performed because Claimant complained of diarrhea and pain, the CT showed that there were no problems found in the abdomen or otherwise to explain Claimant's supposed symptoms. (Tr. at 540). Likewise, Claimant's statements to the hospital, Dr. Wagner's notes, and the emergency room note cited above all merely reiterate that Claimant reported to have irritable bowel syndrome, but no tests or examinations confirmed the problem. (Tr. at 268, 340, 434).

The ALJ's findings related to Claimant's alleged irritable bowel syndrome are supported by substantial evidence.  Claimant has not been diagnosed with irritable bowel syndrome, and, as the medical evidence above indicates, the ALJ's observations about the medical evidence of record related to this condition are accurate. Despite finding this condition to be non-severe, the ALJ considered Claimant's testimony about the subjective symptoms resulting from this condition in his pain and credibility

analysis.  (Tr. at 19).  Furthermore, as is required by SSR 96-8p, the ALJ considered the limitations and restrictions imposed by Claimant's alleged irritable bowel syndrome, a non-severe impairment.  SSR 96-8p, 1996 WL 362207, *34477 (July 2, 1996).

**B. <u>The ALJ's Determination that Claimant's Borderline IQ is not a Severe Impairment</u>**

Claimant next argues that the ALJ "does not explain at all what evidence assisted him in arriving at the mental residual functional capacity evaluation.  He does not even mention the IQ test findings that showed the claimant had significant subaverage intelligence."  (Pl.'s Br. at 9.)  In the same vein, Claimant asserts that the ALJ erred in failing to find that Claimant's borderline intellectual functioning is a severe mental impairment, failed to discuss how it affected Claimant's ability to function and failed to include it in a hypothetical question to the vocational expert.  (Pl.'s Br. At 11-12).

In assessing Claimant's anxiety and depression, the court finds that the ALJ complied with the above regulations.  Furthermore, the ALJ's findings are supported by substantial evidence.

Here, the ALJ thoroughly followed each step enumerated in 20  C.F.R. §§ 404.1520a and 416.920a. The ALJ considered the medical records from Franklin Regional Medical Center ("Exhibits 1F" and "3F"), treatment records from Dr. Wagner ("Exhibits 5F, 8f"), and the consultative exam ("Exhibit 7F"). (Tr. at 16). The ALJ concluded that Claimant's "depression/anxiety is a severe impairment." (Id.).

The ALJ then rated Claimant's functional limitation with respect the four broad areas enumerated in the statute. Noting in detail the evidence and factors that he considered, the ALJ found that Claimant had "mild restriction" in activities of daily living; "mild difficulties" in social functioning, "moderate difficulties" with regard to

concentration, persistence, or pace; and that she experienced "no episodes of decompensation."(Tr. at 17).

Next, the ALJ engaged in a complete analysis and determined that "[t]aking all of claimant's impairments in combination, to include those deemed not severe, they do not meet or equal any of the impairments listed in Appendix 1." (Tr. at 17-18). The listings that the ALJ considered were 12.02 (organic mental disorders) and 12.04 (affective disorders). 20 CFR 404, Subpart P, Appendix I.

Then, because Claimant's depression/anxiety was "severe," but did not meet the criteria in the Listings, the ALJ assessed her RFC. (Tr. at 18). In doing so, the ALJ translated his findings as to impairment-related functional limitations (paragraph "B" criteria) and additional functional criteria (paragraph "C" criteria) into work-related functions in his RFC assessment. Id. Contrary to Claimant's assertions, the ALJ provided an adequate explanation of the evidence that assisted him in arriving at the mental RFC assessment. (Tr. at 20).

Regarding Claimant's borderline intellectual functioning, while the ALJ did not find this to be a severe impairment, the court finds this was harmless error for the following reasons:

1.  In his RFC, the ALJ found that Claimant was "moderately limited in the ability to understand, remember and carry out detailed instructions, but remains able to perform repetitive activities." (Tr. at 18).

2.  During the administrative hearing before the ALJ, Claimant testified that she was "pretty good" at reading, can "pick up [any non-scientific literature] and know what [she is] reading about," can perform basic mathematical skills, and

that when she worked as a home health care aide, she went grocery shopping and paid the bills for her clients, amongst other duties. (Tr. at 41, 43).

3. At the administrative hearing, the ALJ asked the vocational expert, Ms. Baldwin, if she could identify any jobs in the regional or national economy for an individual with a sixth grade education, with sixth grade reading and third grade math and spelling skills, and with the limitations listed above at # 1. The vocational expert identified several work classifications.  (Tr. at 65).

Although the ALJ did not find Claimant's borderline intellectual functioning to be a severe impairment, any limitations resulting from this impairment were included by the ALJ in his RFC  finding and in the hypothetical question posed to the vocational expert.  As such, any error by the ALJ in this regard was harmless. See *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *Bishop v. Barnhart,* No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

### C. **The ALJ's Hypothetical Offered to the Vocational Expert**

Claimant's argument relating to the hypothetical question posed to the vocational expert is twofold.   First, Claimant argues that the ALJ found that Claimant had moderate difficulties in concentration, persistence and pace, but that in his RFC, found that Claimant was "moderately limited in the ability to understand, remember and carry out detailed instructions, but remains able to perform repetitive activities." (Pl.'s Br. at 12).  Second, Claimant argues that the ALJ asked the vocational expert that if he "were to afford the Claimant full credibility and she was supported by the medical evidence of record, would there be any work?" Id. The vocational expert answered, "no." Id.

Claimant argues that "asking the Vocational Expert to state whether affording the claimant full credibility would result in a finding of disability does not give the reviewing court an opportunity to know exactly what the Vocational Expert was considering." (Pl.'s Br. at 13).

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. *Walker v. Bowen*, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." *Id.* at 51.

Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. *Benenate v. Schweiker*, 719 F.2d 291, 292 (8th Cir. 1983).

In response to Claimant's arguments, the Court finds that the ALJ's hypothetical and RFC assessment met the above requirements. The vocational expert considered all of the evidence, stating on the record that she reviewed Claimant's "file and the testimony." ( Tr. at 65). Further, the ALJ's hypothetical reflects Claimant's limitations as supported by the record and is consistent with the RFC.

Contrary to Claimant's assertion, it is clear that when the ALJ requested the expert to afford "full credibility," that the expert considered Claimant's symptoms

24

exactly as Claimant related them, rather than as they are supported by the medical evidence. Uncertainty of what the vocational expert considered is not a concern.

### D. <u>**The ALJ's Consideration of the Treating Physician's Opinion**</u>

Claimant's final objection is that the ALJ failed to give adequate consideration to the opinion of Claimant's treating physician.  Claimant argues the following:

> It would have been simple to have asked either the doctor or the claimant to produce those records.  The ALJ was aware that the claimant had sent the RFC form to the doctor.  In fact the claimant requested additional time to update the record and was told by the ALJ he could have ten days.  Council also mentioned that he had sent a functional capacity form to Dr. Shah.  The ALJ simply responded that if he received one "we will see where we go from there"...It would have been much simpler to ask the claimant to make sure that any medical records would accompany the functional capacity form in question.

(Pl.'s Br. at 14.)

Claimant's argument regarding additional evidence from Dr. Shah is perplexing, considering the fact that the ALJ made every effort to accommodate her requests. At the conclusion of her administrative hearing, Claimant requested additional time to "attempt to submit" records from Dr. Pack and Dr. Shaw. (Tr. at 66). The ALJ initially granted her ten days to do so, but at her request, enlarged it to two full weeks. (Tr. at 66-67). Despite the fact that the ALJ left the record open and granted Claimant leave to present additional evidence from Dr. Pack and Dr. Shaw, Plaintiff failed to present any treatment notes or other evidence in support of her position.

In his decision, the ALJ made the following residual functional capacity finding:

> [C]laimant has the [RFC] to perform medium work, as defined in 20 CFR 404.1567(c) and 416.976(c) except she can perform frequent climbing, balancing, stooping, crouching, kneeling or crawling. She reads at 6th grade level and performs math and spelling at the 3rd grade level. She is moderately limited in ability to understand, remember and carry out detailed instructions, but remains able to perform repetitive activities. She should avoid concentrated exposure to temperature extremes, smoke, fumes, odors, dust, and pulmonary irritants.

(Tr. at 18).

In support thereof, the ALJ pointed to the following medical evidence. He noted that the although the treatment notes show a history of mitral valve prolapse, the heart examination was within normal limits, the "heart catheterization showed no significant coronary artery stenosis at the left anterior descending and only 20 percent stenosis of the right carotid artery." (Tr. at 21).  Also, Claimant had an abnormal stress test, her echocardiogram was normal and left heart catheterization showed normal coronary arteries and left ventricular function. Id. For her complaints of pain and fatigue, she was prescribed Ultram, but was not prescribed physical therapy, a brace, or a TENS unit. (Id.). Finally, she had COPD, but continued to smoke cigarettes and there was no evidence of pulmonary function studies. (Id.).

The ALJ was mindful of Dr. Shah's contrary opinion. The ALJ thoroughly discussed Dr. Shah's observation that Claimant was limited to "less than a full range of sedentary work" with a range of limitations. Id. However, the ALJ noted that there were "no treatment notes from Dr. Shah" and "no objective tests to support these limitations." (Id.). Rather, the limitations opined by Dr. Shah were "solely based" on Claimant's "subjective complaints" and were "not supported by the record as a whole." (Id.).

As discussed above, Claimant failed to proffer any additional evidence from Dr. Shah. Further, Dr. Shah was not Claimant's long-term treating physician. Claimant began seeing Dr. Shah six months before the administrative hearing. (Tr. at 64). Before switching to Dr. Shah, Claimant saw Dr. Pack for a mere total of sixteen months. (Tr. at 544). Both doctors relied on Claimant's subjective complaints regarding her ailments, symptoms, and medical record because she was a new patient and they were unfamiliar with her medical history.

26

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2008). Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater,* 924 F. Supp. 53, 55 (W.D. Va. 1996); *See* also, 20 C.F.R. § 404.1527(d)(2) (2008).

Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight generally is given to an examiner than to a non-examiner. Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the

record." *Martin v. Secretary of Health, Education and Welfare*, 492 F.2d 905, 908 (4th Cir. 1974); *Hayes v. Gardener*, 376 F.2d 517, 520-21 (4th Cir. 1967).  Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).

The Court finds that the ALJ adequately weighed the medical evidence of record in keeping with the applicable regulations and case law and his findings are supported by substantial evidence.  The ALJ thoroughly considered the entire record, including the objective medical evidence.  (Tr. at 18-21).  The ALJ did not err in his consideration of the evidence from Dr. Shah.  Dr. Shah's assessment was not supported by his own treatment notes or objective tests, nor was it supported by the other evidence of record.  Moreover, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled.   20 C.F.R. §§ 404.1512(a) and 416.912(a) (2008). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment.  *Id.* at §§ 404.1512(c) and 416.912(c).

### V.       Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence.   Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** September 27, 2010.

Cheryl A. Eifert
United States Magistrate Judge

28